# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No.: |
| **JARED D. EAKES, and JAMES BLAKE DAUGHTRY,** | **JURY DEMAND** |
| **Defendants.** | |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("Commission" or "SEC"), alleges the following:

## OVERVIEW

1.     Between at least January 2019 and December 2019, Defendant Jared D. Eakes misappropriated over $2.6 million from clients of GraySail Advisers, LLC, an investment advisor firm that Eakes owned and controlled.

2.     Eakes did so primarily by causing these clients to purchase fake promissory notes purportedly issued by a company called Small World Capital, LLC.

3.     In truth, the notes were not issued by Small World Capital, as Eakes had no authority to act on behalf of that entity.

4.     Several of the defrauded clients had previously been advisory clients of Defendant James Blake Daughtry prior to joining GraySail.

5.      Daughtry failed to tell these clients that Eakes was paying him for selling his advisory and brokerage business and moving his clients to GraySail.

6.     For these clients, after the sale to GraySail was complete, Daughtry expected to continue his existing practice of reviewing transactions in the client's account with the client before those transactions were executed by Eakes.  In fact, Daughtry did not do this, but never told these clients that he had stopped reviewing transactions with them.

7.      Daughtry also recruited new clients to GraySail following the sale of his advisory business to Eakes.

8.     He told these clients that he would monitor their accounts, and review any proposed investments with GraySail before such investments were consummated.

9.     Daughtry failed to abide by these promises, even when several clients raised questions about certain investments that had been made in their accounts with GraySail.

10.     Daughtry's failure to exercise the requisite care for his clients, once their accounts were at GraySail, enabled Eakes to defraud these clients.

## VIOLATIONS

11.     Defendant Eakes has engaged in acts or practices that violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), (3)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (c) ], and Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2)].  Unless restrained and enjoined by this Court, Eakes will continue to engage in acts and practices that violate these provisions.

12.     Defendant Daughtry has engaged in acts or practices that violated Section 206(2) of the Advisers Act.  Unless restrained and enjoined by this Court, Daughtry will continue to engage in acts and practices that violate this provision.

## JURISDICTION AND VENUE

13.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v], Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] and Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(b) and (d)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this complaint,

and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties, and for other equitable relief.

14.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14(a)].

15.     Defendants, directly and indirectly, made use of the mails, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

16.     Venue is proper in this Court because certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act, the Exchange Act and the Advisers Act occurred in the Middle District of Florida.

**THE DEFENDANTS**

17.     Jared D. Eakes ("Eakes"), age 31, is believed to be a resident of Jacksonville, Florida.  From October 2018 through August 2019, Eakes was the sole owner, President, and an investment adviser representative ("IAR") of GraySail Advisors, LLC.  From 2016 to February 2018, Eakes was a registered representative ("RR") with Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch").  Eakes previously has held Series 6 and 63 licenses.

18.     James Blake Daughtry ("Daughtry"), age 50, resides in Dothan,

Alabama.  From September 1999 to March 2020, Daughtry operated a small

investment advisory business in Dothan, Alabama.  During this time, he was

associated with various registered investment advisers and broker-dealers.  From

2015 to 2020, Daughtry was dually-registered as an RR with Kestra Investment

Services, LLC and an IAR with Kestra Advisory Services, LLC (collectively,

"Kestra"), and he previously served as an RR and/or IAR of: Ameriprise Financial

Services, Inc. (2010-2015); Sterne Agee Financial Services, Inc. and Sterne Agee

Investment Advisors, Inc. (2008-2010); and Wachovia Securities, LLC (2005-

2008).  Daughtry previously has held Series 7, 63, and 65 licenses.

## RELATED ENTITY

19.     GraySail Advisors, LLC, was organized by Eakes as a Wyoming

limited liability company on October 1, 2018, and dissolved on September 27, 2019.

GraySail, which was headquartered in Jacksonville, Florida, began reporting to the

Commission as an Exempt Reporting Adviser ("ERA") on October 25, 2018.

GraySail also reported as an ERA to Texas and Florida, and subsequently registered

as an investment adviser with Delaware and Michigan.  On August 14, 2019,

GraySail filed a Form ADV-W, withdrawing its registration as an ERA.

## Eakes Acquires Daughtry's Advisory Business

20.     In late 2018, Daughtry advertised his advisory business for sale on a

platform that connects financial professionals interested in buying, selling, or

merging their businesses.  At the time, Daughtry was an RR and IAR of Kestra, and operated a solo advisory business that served 130-140 households, with assets under management ("AUM") of approximately $45 million.  Approximately 60% of Daughtry's accounts were fee-based advisory accounts, and the other 40% were commission-based brokerage accounts.

21.     In March 2019, Daughtry sold his business to GraySail pursuant to a "Merger and Contract Agreement," under which GraySail acquired certain "Purchased Assets," which included "all clients [and] client accounts," further defined as approximately $43 million in AUM, comprising 150 clients and 250 accounts – *i.e.*, Daughtry's entire advisory and brokerage business.

22.     Pursuant to his contract with GraySail, Daughtry agreed to continue to serve as an investment adviser for those clients that moved to that firm for at least three years.

23.     In exchange, Daughtry was to receive: (i) $1,000,000 (payable in seven installments over three years); (ii) $100,000 towards the purchase of two personal vehicles; (iii) a monthly "royalty" of $4,333.33 for the remainder of the life of Daughtry and Daughtry's then current wife; and (iv) a "[f]loor value of $1,500,000 in stock options to be used in a future IPO and[/]or liquidity event," vesting after three years.

24.     Daughtry conducted very limited due diligence prior to selling his

business to GraySail.

25.    Daughtry did not conduct any due diligence into GraySail's financial condition or AUM.

26.    Even though he looked at GraySail's Form ADV before the sale, he did not review it closely enough to see that GraySail claimed therein that it qualified as an ERA that advised only private funds, or that it reported only one client and total AUM of ten dollars.

27.    Daughtry accepted without any verification Eakes' claim that GraySail had approximately $100 million in AUM.

28.    In connection with the sale of his business, Daughtry moved 33 Kestra clients to GraySail and signed up seven new clients for GraySail.  In total, Daughtry brought approximately $7.8 million in AUM to GraySail.

29.    Initially, despite Eakes' frequent assurances to Daughtry that Eakes planned to open or acquire a registered broker-dealer, Eakes' purported plans never materialized.  Consequently, Daughtry could not move brokerage accounts to GraySail.

30.    GraySail also was slow in moving advisory clients from Kestra to GraySail, and Daughtry knew that significantly more issues were arising in connection with this move in comparison to his prior moves from one firm to

another.  These issues caused Daughtry to question Eakes' competence from the early stages of the process.

31.     While Daughtry slowly moved some clients to GraySail and waited for GraySail to fix its problems, he kept the rest of his clients at, and continued to be paid by, Kestra.  Daughtry knew that this arrangement violated Kestra's policies and procedures and was possible only because he never told Kestra about GraySail.

32.     Daughtry did not disclose his GraySail relationship to Kestra because he did not want Kestra to try to retain his clients.

33.     Kestra promptly terminated Daughtry in March 2020 when it learned of his association with GraySail.

34.     When moving his clients to GraySail, Daughtry told his clients very little about that firm.  For example, when talking to existing and prospective clients about his – and their – move to GraySail, Daughtry described the sale as a merger, but he did not disclose that he had already sold all of his clients and their accounts to GraySail in exchange for $1 million, $100,000 for two cars, a monthly stipend for life, and future options.

35.     Daughtry had several of his clients moving to GraySail sign a "Trading and Management Agreement" (the "GraySail Advisory Agreement"), which gave GraySail a limited power of attorney and broad discretionary authority over its clients' assets.

36.    Some of Daughtry's clients only received the signature pages of these agreements.

37.    Daughtry anticipated that, even though his clients would move to GraySail, he would continue his practice of reviewing with them any transactions in their accounts prior to those transactions being executed.  In fact, Daughtry did not do this and never told the clients that he moved to GraySail that he had discontinued this practice.

38.    Daughtry also told new clients that he recruited to GraySail that he and they would agree on specific investments at a subsequent meeting and/or that their money would be held in a money market account until both (i) he and Eakes agreed on investments and (ii) Daughtry had discussed the investments with the clients.

**Eakes Misappropriates from Daughtry's Clients**

39.    Between May and November 2019, Eakes stole approximately $2 million from ten Daughtry clients.

40.    The most common mechanism that Eakes used to defraud Daughtry's clients involved the sale of Small World unsecured promissory notes to clients.

41.    Eakes, who was not authorized to act on behalf of Small World, created fake Small World notes and forged the signature of a Small World principal on each note.

42.    The notes had an annual percentage rate ("APR") of 6.5%, provided for

quarterly interest payments with the principal due at maturity, and had a nine-month initial term that renewed automatically unless canceled by the investor.

43.     Eakes caused five Daughtry-client accounts to purchase approximately $1.5 million in bogus Small World promissory notes.  Eakes did not disclose these sales to Daughtry or his clients.  Rather, Eakes photocopied or cut-and-pasted client signatures from other documents onto the promissory notes, submitted the notes to the firm that administered the clients' Individual Retirement Accounts ("the IRA Administrator"), transferred the proceeds from clients' IRA accounts at that firm to a Small World bank account, and then convinced the unwitting account holder to transfer those funds to Eakes.

44.     In August 2019, shortly after the Commission's Division of Examinations notified GraySail that it would be conducting an exam of GraySail, Eakes withdrew GraySail's ERA filing such that GraySail would no longer be subject to Commission exams.

45.     Upon learning of GraySail's withdrawal, the IRA Administrator revoked GraySail's privileges and access to accounts at that firm.

46.     Thereafter, Eakes submitted email requests to the IRA Administrator (purportedly from his clients) to liquidate ten Daughtry-client accounts and send checks to a P.O. Box in Jacksonville.

47.     In October 2019, the IRA Administrator issued checks pursuant to the

instructions in the emails.  Eakes successfully cashed a check for $115,182.42 intended for one client before the IRA Administrator realized that all of the checks were sent to the same address, issued stop-payment orders, and notified the affected clients.

48.     In November 2019, in an attempt to continue his fraud, Eakes created a new entity, Your Advisor Group, LLC ("YAG"), which he reported to Alabama and Texas as an ERA and registered with Michigan as an investment adviser.

49.     In the documents filed with at least some of these states, Eakes listed a third party as the Chief Compliance Officer of YAG, without the knowledge or consent of that third party.

50.     Eakes then appended GraySail Advisory Agreement signature pages to a new YAG Trading and Management Agreement, which he used to try to open discretionary accounts at another broker-dealer.  However, that broker-dealer discovered Eakes' misconduct after several accounts were accessed from the same IP address.  Thereafter, the broker-dealer contacted the named account holders, froze all accounts that had been funded, and closed unfunded accounts.

51.     Eakes used the money he misappropriated from Daughtry's clients for several purposes, including: (i) transferring $1.6 million to his personal brokerage accounts, where he made a profit of $540,000 in one month before losing almost the entire principal and earnings through trading; (ii) paying Daughtry $293,558; (iii)

transferring $116,000 to a Las Vegas casino and withdrawing another $276,000 in cash while in Las Vegas; (iv) paying $37,000 towards his student loans; (v) paying off a $50,000 business loan; and (vi) repaying $80,500 to three other GraySail clients from whom he had misappropriated a total of $93,000.

## **Daughtry Breached His Fiduciary Duties to His Clients**

52.     Daughtry breached his fiduciary duties to the clients that he moved and/or recruited to GraySail by, among other things, failing to take appropriate steps to protect those clients' best interests when faced with mounting concerns about Eakes' behavior.

53.     Daughtry, who had previous experience moving clients to new investment advisers, understood that it typically took less than two weeks for him to obtain access to accounts once they had been moved to a new advisory firm.

54.     Nevertheless, Daughtry continued to move both existing and new clients to GraySail for months despite *never*: (i) gaining access to their GraySail accounts; (ii) having the ability to enter transactions on their behalf; or (iii) consulting with Eakes about potential transactions in client accounts before Eakes executed those transactions.

55.     Although he occasionally told some clients that he lacked access to their accounts at GraySail, Daughtry never told those clients that Eakes had ignored his repeated requests for access.

-12-

56.    Instead, Daughtry assured his clients that everything was in order and that Eakes was working on providing Daughtry access to their portfolios.

57.    Although Daughtry occasionally saw IRA Administrator account statements from those clients who showed them to him when asking questions about activity in the account, Daughtry either did not receive or did not review account statements for his clients that did not complain.

58.    For those clients who did not show their statements to Daughtry, Daughtry had no way of knowing what investments, if any, had been made in those accounts.

59.    Daughtry also did not respond appropriately to concerns raised by his clients once their accounts had been moved to GraySail.

60.    For example, in October 2019, one client showed Daughtry an Equity Trust statement that reflected a $231,752 investment in a Small World "unsecured promissory note."

61.    Daughtry did very little in response.  He merely asked Eakes what the investment was, accepted Eakes' answer that it was a private equity fund investment (despite the fact that it was listed as a promissory note) that mistakenly was made in the wrong account, and told Eakes that private equity fund investments were not suitable for his conservative clients.

62.    Daughtry, however, did not attempt to determine independently what

-13-

the investment was or whether Eakes had put other clients into Small World notes or other unsuitable investments.

63.     Likewise, when another client complained about unauthorized transactions in his account, Daughtry accepted Eakes' response that the transactions were made in error and repeated Eakes' explanation to the client.

64.     Again, Daughtry did not verify Eakes' explanation or determine whether Eakes had engaged in unauthorized trades in other client accounts.

65.     Daughtry also accepted and conveyed to clients Eakes' explanations concerning distribution issues, attempted sales of annuities held by clients, and other issues, without any effort to independently verify the accuracy of Eakes' claims.

66.     And, when clients questioned Daughtry about notices they received from Equity Trust informing them that it had terminated its agreement with GraySail and Eakes because GraySail was no longer registered as an investment adviser, Daughtry did not investigate the reasons for the notice.

67.     Instead, Daughtry accepted, and repeated to his clients, Eakes' lie that Equity Trust's notice stemmed from an Equity Trust clerical error regarding GraySail's CRD number.  Daughtry also did not inform his clients when, in November 2019, Eakes informed him that he had formed, and was moving GraySail's clients to, YAG.

**<u>Eakes Defrauds Other Non-Daughtry Clients</u>**

-14-

68.     Eakes' fraud was not limited to Daughtry's clients.

69.     For example, in 2019 GraySail acquired seven clients, with AUM of roughly $850,000, from a broker-dealer registered representative in Arkansas.

70.     Eakes began stealing from these clients almost immediately upon gaining access to their assets.

71.     Between February and December 2019, Eakes misappropriated approximately $660,000 from six of these clients, primarily by purchasing fraudulent Small World notes in their accounts.

72.     Eakes used the money he misappropriated from these clients for several purposes, including: (i) transferring $451,000 to his personal brokerage account, where he promptly lost almost the entire amount trading in options; and (ii) paying Daughtry $209,000 towards the purchase of his advisory business.

## COUNT I—FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

### (Eakes)

73.     Paragraphs 1 through 72 are hereby re-alleged and incorporated herein by reference.

74.     Between at least January 2019 and December 2019, Eakes, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails,

directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities; all as more particularly described above.

75.    Eakes knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

76.    While engaging in the course of conduct described above, Eakes acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

77.    By reason of the foregoing, Eakes, directly and indirectly, violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II—FRAUD

### Violations of Section 17(a)(3) of the Securities Act
### [15 U.S.C. § 77q(a)(3)]

### (Eakes)

78.    Paragraphs 1 through 72 are hereby re-alleged and incorporated herein by reference.

79.    Between at least January 2019 and December 2019, Eakes, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such

securities; all as more particularly described above.

80.     By reason of the foregoing, Eakes directly and indirectly violated and, unless enjoined, will continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT III—FRAUD

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. §§ 240.10b-5(a) and (c)]

### (Eakes)

81.     Paragraphs 1 through 72 are hereby re-alleged and incorporated herein by reference.

82.     Between at least January 2019 and December 2019, Eakes, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

     a.   employed devices, schemes, and artifices to defraud; and

     b.   engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities; all as more particularly described above.

83.     Eakes intentionally and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, Eakes acted with scienter,

that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

84.    By reason of the foregoing, Eakes directly and indirectly violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Sections (a) and (c) of Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5(a), (c)].

## COUNT IV—FRAUD

### Violations of Sections 206(1) of the Advisers Act
### [15 U.S.C. § 80b-6(1)]

### (Eakes)

85.    Paragraphs 1 through 722 are hereby re-alleged and incorporated herein by reference.

86.    From at least January 2019 through December 2019, Eakes, acting as an investment adviser, by the use of the mails and the means and instrumentalities of interstate commerce, directly and indirectly, employed devices, schemes and artifices to defraud one or more advisory clients and/or prospective clients.

87.    Eakes knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.  In engaging in such conduct, Eakes acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

-18-

88.     By reason of the foregoing, Eakes, directly and indirectly, has violated, and, unless enjoined, will continue to violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT V—FRAUD

### Violations of Section 206(2) of the Advisers Act
### [15 U.S.C. § 80b-6(2)]

### (Eakes and Daughtry)

89.     Paragraphs 1 through 722 are hereby re-alleged and incorporated herein by reference.

90.     From at least January 2019 through December 2019, Eakes and Daughtry, acting as investment advisers, by the use of the mails and the means and instrumentalities of interstate commerce, directly and indirectly, engaged in transactions, practices, and courses of business which would and did operate as a fraud and deceit on one or more advisory clients and/or prospective clients.

91.     Eakes and Daughtry acted at least negligently when engaging in the aforesaid transactions, practices, and courses of business.

92.     By reason of the foregoing, Eakes and Daughtry directly and indirectly have violated and, unless enjoined, will continue to violate Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

### I.

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that Defendants committed the violations alleged;

### II.

An order permanently restraining and enjoining Eakes, his officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (3) ]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (c)]; and Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)];

### III.

An order permanently restraining and enjoining Eakes from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account;

**IV.**

An order permanently restraining and enjoining Daughtry, his officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)];

**V.**

An order requiring Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

**VI.**

An order requiring Defendants to each pay a civil penalty pursuant to Section 209 of the Advisers Act [15 U.S.C. § 80b-9]; and

**VII.**

The grant of such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

**JURY TRIAL DEMAND**

The Commission hereby demands a trial by jury as to all issues that may be so tried.

This 28th day of September, 2022.

Respectfully submitted,

*/s/M. Graham Loomis*
M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Paul T. Kim
Senior Trial Counsel
Georgia Bar No. 418841
kimpau@sec.gov


Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel: (404) 842-7600
Facsimile: (404) 842-767